IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| RYAN JASON SINK, | ) | |
|     Plaintiff, | ) | CASE NO. 7:18CV00350 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| L. WANG, ET AL., | ) | By: Hon. Glen E. Conrad |
|     Defendants. | ) | Senior United States District Judge |

In this civil rights action under 42 U.S.C. § 1983, plaintiff Ryan Jason Sink, a Virginia Department of Corrections ("VDOC") inmate proceeding pro se, alleges that the defendants acted with deliberate indifference to his serious medical needs. After review of the record, the court concludes that the defendants are entitled to summary judgment.

I.     BACKGROUND.

Sink has been incarcerated at Green Rock Correctional Center ("Green Rock") for several years. "In mid-July 2017, according to the complaint, Sink allegedly started to experience sharp pain in his neck, shooting down his arm, and shortness of breath. Fearing a heart attack, he went the medical unit." Sink v. Wang, No. 7:18CV00350, 2020 WL 927697, at *1 (W.D. Va. Feb. 26, 2020). Dr. Wang, the prison physician, diagnosed him with a probable pulled muscle and provided treatment. Sink alleges that:

> Nurse Autry was in charge of the medical unit when Sink came in on the morning of August 7, 2017. He was in a wheelchair, complaining of severe pain and an inability to walk or stand. After Sink was placed in the medical isolation cell, no medical staff member talked to him, physically examined him, or offered him any treatment for the pain that had prompted him to seek medical attention that day. Before Nurse Autry completed her shift, she did not ensure that Sink was evaluated to see if he had a need for immediate treatment of that pain.

Id. at *5. Over the next several months, Sink saw Dr. Wang several times, along with a physical therapist, and received various medications, adjusted dosages, and diagnostic tests. Ultimately, in

September 2017, Dr. Wang referred Sink to a neurosurgeon, who diagnosed two pinched nerves and two slipped discs and recommended surgery, which was performed in December 2017.

After Sink complained in April, May, and June of 2018 that he was having pain while trying to sleep post-surgery, the surgeon, Dr. McCleary, repeatedly recommended a cervical pillow/wedge. Dr. Wang did not process an order for such a device. Sink contends that Warden Davis knew about Sink's request for a wedge pillow through his grievances, but Davis did not ensure that he received the recommended pillow.

In Sink's § 1983 complaint, dated in January of 2019, he sued Dr. Wang, Nurse Autry, and Davis, who then filed dispositive motions.[1] The court dismissed all claims against Dr. Wang and Davis concerning the period from July through December of 2017. Id. at *6. The court denied dismissal of the following: a claim that Nurse Autry denied Sink necessary treatment on August 7, 2017, and a claim that in April, May, and June of 2018, Dr. Wang denied Sink the cervical wedge pillow that the surgeon recommended, and Davis failed to correct this omission. Id. at *7.

The remaining defendants have now filed motions for summary judgment, supported by affidavits, declarations, and medical records. See gen. Mem. Supp. Mot. Summ. J., Autry Decl. and Wang Decl., ECF No. 71; Mem Supp. Mot. Summ. J., Davis Aff., Amonette Decl., ECF No. 97. Sink has responded, making the motions ripe for disposition.

II. DISCUSSION.

A. Standards of Law.

A court should grant summary judgment only when the pleadings, responses to discovery, and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); see, e.g., Celotex Corp. v. Catrett,

---

[1] Sink also sued two other VDOC administrators, Herrick and Amonette, but the court later granted Sink's motion to dismiss all claims against these defendants.

2

477 U.S. 317, 322-23 (1986). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. Id. at 255. To be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" and that "the evidence is so one-sided that one party must prevail as a matter of law." Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky., 93 F.3d 230, 233 (6th Cir. 1996). When a motion for summary judgment is made and is properly supported by affidavits, depositions, or answers to interrogatories, the nonmoving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find in his favor. Anderson, 477 U.S. at 256-57.

To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).[2] To hold an official liable under § 1983, the plaintiff must state facts to affirmatively show that the officer acted personally to deprive the plaintiff of or violate his constitutional rights. Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977).

An inmate's Eighth Amendment protections against cruel and unusual punishment include a right to the medical care necessary to address his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 103-04 (1976). Specifically, a prison official's "deliberate indifference to an inmate's

---

[2] The court has omitted internal quotation marks, alterations, and/or citations here and throughout this memorandum opinion, unless otherwise noted.

serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014).

The medical need portion of this legal standard is objective. It requires showing that the inmate's medical condition is "serious—one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. The other portion of the standard, deliberate indifference, is subjective. The plaintiff must show that each defendant knew of and disregarded an excessive risk to inmate safety or health. Farmer v. Brennan, 511 U.S. 825, 837 (1994). It is not sufficient to show that an official should have known of a risk; rather, the official "must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk of harm posed by the official's action or inaction." Jackson, 775 F.3d at 178. "This deliberate indifference standard is not satisfied by a showing of mere negligence, a mere error of judgment or inadvertent failure to provide medical care, or mere disagreement concerning questions of medical judgment." Germain v. Shearin, 531 F. App'x 392, 395 (4th Cir. 2013); Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977) ("[T]he essential test is one of medical necessity and not simply that which may be considered merely desirable.").

B. Nurse Autry.

In support of Nurse Autry's motion for summary judgment, she presents the following evidence that is undisputed, except as otherwise noted. On July 15, 2017, at 7:30 a.m., officers brought Sink to the medical unit complaining of severe pain and numbness in his shoulder and neck. "He believed he pulled a muscle in his neck while jumping up on his top bunk. He refused ibuprofen and was to be monitored in medical. At 9:00 [a.m.], he reported the pain was better and

4

requested to go back to his cell. He was released and referred to Dr. Wang for evaluation." Autry Decl. ¶ 3, ECF 110-1. Dr. Wang examined Sink on July 25, 2017, for the pulled muscle complaint.

On August 7, 2017, Nurse Autry worked from 6:00 a.m. to 4:30 p.m. Around 6:30 a.m., officers brought Sink into the medical unit in a wheelchair for a diabetic checkup. At that time, Nurse Autry was in the pharmacy, a separate room within the medical unit, so she did not personally witness Sink's behavior in the unit. Proper procedure required Sink to fill out a sick call request to be examined later in the medical unit for such a complaint. When Sink was so informed, he "began laying on the floor and refused to get up" or "to have his blood sugar checked." Autry Decl. ¶ 6, ECF No. 71-1. Because of his noncompliant behavior, security officers removed Sink from the medical unit and transported him to segregation for several hours. Others reported this information to Nurse Autry who entered it in Sink's medical record. Nurse Autry believed that on August 7, 2017, Sink was experiencing symptoms of his previously treated pulled shoulder muscle. Autry Decl. ¶ 5, ECF No. 110-1. No one reported to Nurse Autry that "Sink's behavior (laying on the floor and refusing to get up) was due to a medical condition. Rather it was reported to [her] that Sink was being disruptive and noncompliant with medical's directive to fill out a sick call form." Id. at ¶¶ 9-10.

According to prison procedures, while Sink was in segregation, officers would have monitored his status on camera and in person. In Nurse Autry's experience, if officers had observed that Sink was in severe distress, they would have notified medical staff or transported Sink back to the medical unit. Nurse Autry did not receive any calls from segregation about Sink that day.[3] About 12:30 p.m., officers transported Sink back to the medical unit and placed him in

---

[3] Sink has stated that while he was in segregation on August 7, 2017, he begged for medical attention for his severe shoulder pain, but it is undisputed that Nurse Autry was not present in the segregation unit to hear these pleas.

5

a medical isolation cell. At that point, Nurse Autry spoke with Sink about his subjective complaints of shoulder/neck pain and stiffness.[4] In response, Nurse Autry consulted with Dr. Wang and "relayed Sink's medical complaints, clinical status, and current medication schedule. Dr. Wang directed [the nursing staff] to monitor Sink and stated he would see [Sink] on the morning of August 8, 2017. Dr. Wang did not order Sink any additional medications nor direct [Nurse Autry] to provide him with Tylenol or any other additional pain reliever." Id. at ¶ 18.

According to Nurse Autry, officers and the medical staff monitored Sink's condition in the medical isolation cell. During her shift as charge nurse, other staff would have reported to her if Sink had appeared to be in any severe distress. Nurse Autry did not receive any such reports.[5] She also does not recall personally observing Sink to objectively appear to be in severe distress during her shift.

Nurse Autry states that when Sink arrived in the medical unit on August 7, 2017, he did not report to staff that he had suffered any new injury. Sink's medical records indicated Dr. Wang's prior diagnosis of a pulled neck muscle. They also reflected that Sink had been prescribed and was receiving the medication Neurontin, morning and evening—a medication that he received as scheduled on August 7, 2017. Although that medication had been prescribed for a diabetic pain condition, Dr. Wang was entitled to take Sink's current medication regimen into account when considering treatment necessary for his symptoms until the doctor could examine him the next morning. Nurse Autry "reported to the next shift of medical personnel regarding Ryan Sink's

---

[4] Sink has stated that Nurse Autry spoke to him about his shoulder pain when she brought him his insulin about 1:00 on August 7, 2017. Medical records, however, indicate that another nurse delivered the insulin to Sink that day.

[5] Sink claims that his pain was so severe that he could not stand or walk to the toilet to relieve himself or to retrieve the lunch tray that staff offered to him. Nurse Autry received a report that Sink had refused his lunch and entered that fact into his medical record. Sink offers no evidence, however, on which he could show that Nurse Autry knew from her own observation or reports from others that his pain prevented him from standing or walking in his cell.

6


complaints and status. [She] did not work on August 8, 2017." Id. at ¶¶ 19-21. Nurse Autry states that she "believed that [her] actions with regard to Ryan Sink were sufficient because (1) [she] believed he was suffering symptoms of a pulled muscle and (2) [she] was following Dr. Wang's orders." Id. at ¶ 26.

In response to Sink's informal complaint about the August 7, 2017 incident, an official responded as follows:

> According to your medical record, you came into medical on 8.7.17 demanding to receive treatment for shoulder pain. . . . At the time, you were already on Neurontin 400 mg twice daily for pain. The nursing staff was aware of your complaint during their shift and were able to observe you once you had been placed in the isolation cell. The night nurse did vital signs and an assessment at approximately 0541 the following morning. Dr. Wang saw you the following morning and ordered X-Rays, pain medication, and steroids. You were released to the general population later that day.

Mem. Opp'n Mot. Summ. J., Doc. K, ECF No. 104-2. Sink filed a regular grievance on these issues, triggering an investigation. The Level I response verified the validity of the informal complaint response, but because the investigation reflected that unspecified procedures or policies were not followed, Sink's grievance was deemed "Founded." Id. Nurse Autry has stated that as a result of the incident, she "received a verbal counseling documented in a Notice of Improvement Needed/Substandard Performance for noncompliance with DOC Policy 720.2." Id. at Doc. L3.

After careful review of the parties' submissions, the court concludes that Sink has not presented sufficient evidence from which he could persuade a fact finder that Nurse Autry acted with deliberate indifference. The court will presume without finding that Sink's neck and shoulder pain on August 7, 2017, presented a serious medical need for treatment. It is undisputed, however, that Nurse Autry was not present in the area of the medical unit where Sink first arrived that day and that she did not witness Sink's behavior which triggered security officers to remove him to the segregation unit. Others reported his actions as simple noncompliance with orders, not as Sink

7

now characterizes his actions, as a result of his alleged inability to stand or sit because of extreme pain. It is also undisputed that Nurse Autry did not receive any calls from segregation that day, indicating that Sink appeared to be in distress that required his sooner return to the medical unit.

When Sink arrived back in the medical unit at around 12:30 p.m., Nurse Autry listened to and noted his reports of pain, relayed them to Dr. Wang, along with Sink's other medical records and medication regimen, and then followed Dr. Wang's instruction—to monitor Sink in a medical isolation cell overnight until he could see the doctor in the morning. Sink received his already-prescribed pain medication that afternoon, and Dr. Wang did not change or add other treatment modalities to that prescription, other than having him monitored in the medical cell. As multiple courts have held, a nurse cannot overrule a doctor's order. See, e.g., Patterson v. Smith, No. 1:20CV202(AJT/MSN), 2020 WL 6928614, at *7 n.10 (E.D. Va. Nov. 24, 2020) (citing other cases). Nurse Autry ended her shift at 4:30 p.m. and did not work the following day. The court simply finds no evidence on which Sink could prove that during the four hours of Nurse Autry's shift while Sink was confined to the medical isolation cell on August 7, 2017, she knew he needed different treatment than he received for his neck and shoulder pain. Thus, Sink has failed to demonstrate deliberate indifference.

In response to the defendants' motion, Sink highlights the fact that prison officials deemed his grievance to be founded, concerning his complaints about the actions of the medical staff on August 7, 2017. This determination reflects that the medical staff failed to follow some VDOC procedure that day, and Nurse Autry has admitted that she was later instructed on proper procedures. It is well established, however, that a "prison official['s] failure to follow internal prison policies [is] not actionable under [section] 1983 unless the alleged breach of policy rises to the level of a constitutional violation." Jackson v. Sampson, 536 F. App'x 356, 357 (4th Cir.

2013). In this context, courts have repeatedly held that "[a] failure to follow official policy, by itself shows, at most, negligence, and cannot support a finding of deliberate indifference." Mason v. Lafayette City-Parish Consol. Gov't, 806 F.3d 268, 279 (5th Cir. 2015); see also McFarlin v. Penzone, No. 19-16153, 2021 WL 872145, at *3 (9th Cir. Mar. 9, 2021) ("The district court was correct that the alleged violation of jail policy was not enough to show deliberate indifference—such allegations, alone, instead support a claim of negligence at the most."); Taylor v. Adams, 221 F.3d 1254, 1259 (11th Cir. 2000) ("[F]ailure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence."); Million v. Grounds, 690 F. App'x 163, 164 (5th Cir. 2017) ("[Defendants'] conduct, even if it departed from prison policy or rules, was at most negligence and not deliberate indifference."). Consistent with these decisions, the court concludes that the fact that Nurse Autry was found to have committed an unspecified policy violation in response to Sink's grievance is insufficient to demonstrate deliberate indifference, as required to establish an Eighth Amendment claim. Accordingly, Nurse Autry is entitled to summary judgment.[7]

## C. Dr. Wang.

In support of Dr. Wang's motion for summary judgment, he presents the following evidence that is undisputed, except as otherwise noted. Sink underwent neck surgery on December 20, 2017, "specifically anterior cervical discectomy C4-5 and C5-6 with allograft arthrodesis and anterior cervical plate." Wang Decl. ¶ 11, ECF No. 71-2. "On February 4, 2018, neurosurgery specialist [Dr. McCreary] noted that Ryan Sink did not report any post-op complications or difficulties. [Neurosurgery] documented contemporaneously that they were pleased with his

---

[7] The court declines to exercise supplemental jurisdiction over any possible supplemental claim related to any state policy violation. See 28 U.S.C. § 1367(c).

9

progress." Id. at ¶ 12. In early April 2018, Sink was receiving Flexeril and Neurontin for pain. Sink reported to Dr. Wang on April 2, 2018, that his pain was much better, but that he was experiencing weakness and sensitivity of his finger. Dr. Wang increased Sink's Neurontin dosage for the pain and ordered a follow up with Dr. McCreary, regarding the complaints of weakness and sensitivity.

Sink saw Dr. McCreary on April 17, 2018. Sink reported improvement in his right arm pain, but continued numbness, tingling, and weakness in that arm. He did not report any postoperative complications or difficulties. Sink also requested a wedge pillow. In his record of the appointment, "Dr. McCreary recommended a magnetic resonance imaging test ("MRI") and X-ray of the cervical spine, a cervical pillow, and an elbow protector." Id. at ¶ 17.

On April 25, 2018, Dr. Wang examined Sink, who complained of severe pain and requested the cervical wedge pillow as the surgeon had recommended. It is undisputed that per VDOC policy, procedure, and/or practice, any recommendation made by an outside physician must be analyzed and evaluated by" the institutional physician, who is then authorized to decide whether to approve and order the recommended treatment for the inmate or to deny it. Id. at ¶ 18. Based on objective assessment of Sink's condition and history, Dr. McCreary's notes, and Dr. Wang's experience with other patients who had undergone and recovered from similar surgical procedures, Dr. Wang did not believe that Sink was in distress that made a wedge pillow medically necessary for his condition. So, the doctor did not place an order for one. Instead, Dr. Wang "ordered a repeat MRI and X-ray to evaluate the source of [Sink's] pain complaints." Id. at ¶ 19.

Sink's cervical spine X-ray and MRI occurred on April 25, 2018, and May 4, 2018, respectively. Dr. Wang examined Sink on May 10, 2018. Sink complained of pain at night and asked for a wedge pillow and elbow pad. Dr. Wang noted that Sink had been observed "in the

hallway playing with the pressure machine, moving both upper extremities without difficulty. Id. at ¶ 21. Dr. Wang states: "Based on my experience, the notes from Neurosurgery, and my assessment of Ryan Sink, I did not feel that a wedge pillow was medically necessary for [him] at that time. I ordered an elbow sleeve for him and a follow up appointment with Neurosurgery."[8] Id.

Dr. Wang saw Sink again on May 23, 2018, when Sink complained of not sleeping at night. He requested a wedge pillow. Dr. Wang states: "Again [Sink's] reported complaints did not match the clinical presentation I was seeing in person while examining the patient. In my assessment, I noted no signs of sleep deprivation. Based on my experience, the notes from Neurosurgery, and my assessment of Ryan Sink, I did not feel that a wedge pillow was medically necessary for [him] at that time." Id. at ¶ 22.

Dr. McCreary examined Sink again on June 1, 2018. Sink reported pain in his right shoulder that radiated down his arm to his fingers, but he did not report neck or back pain except when he was trying to sleep. Dr. McCreary's Health Services Consultation Report of that exam states: "post-op—looks good." Id. at ¶ 23. That report also listed "cervical pillow" under "Treatment and Medications Recommended." Id. Dr. McCreary stated that Sink "has symptoms of mechanical neck pain from facet arthropathy and degenerative disc disease. I think a cervical pillow may be a reasonable accommodation for the mechanical neck pain and stiffness." Mem. Supp. Mot. Summ. J. Ex. C, at 49, ECF No. 71-3.

---

[8] Sink admits that Dr. Wang told him he did not believe the elbow sleeve was medically necessary anyway, but Green Rock had one in stock, so he provided it to Sink.

On June 19, 2018, Dr. Wang submitted "a QMC Consultation Report" for a wedge pillow.[9] That request was denied. The denial stated, "May consider a second pillow at your discretion if there are objective findings of decreased [range of motion] so that he has trouble getting his head on a pillow and needing extra support." Id. at ¶ 24. Dr. Wang assessed that, based on his recent examinations and notes from Neurosurgery, "Sink was not objectively experiencing a decreased range of motion" requiring extra support at night. Id. at ¶ 25. Dr. Wang states that although

> Sink claims to have been seriously injured because he did not receive the wedge pillow he requested, I never saw evidence of such serious injury during my care and treatment of him. He experienced a significant surgery which comes with a prolonged recovery period. To aide his recovery he received specialist consults, numerous imaging studies, pain control, and other treatment modalities as I thought they were medically necessary.

Id. at ¶ 27.

The court has reviewed the records and concludes that Sink's complaints about the treatment decisions by Dr. Wang about the wedge pillow are nothing more than disagreements with the doctor's medical judgment. Courts have consistently found that a patient's mere disagreements with his treating physician over the appropriateness of a particular treatment "fall[s] short of showing deliberate indifference." Jackson, 775 F.3d at 178. The undisputed evidence establishes that in April, May, and June of 2018, Dr. Wang provided treatment to Sink that he believed to be medically necessary for Sink's symptoms. Considering many factors, including past patient experiences, physical assessments and observations of Sink and his symptoms and condition over time, Sink's verbal complaints, results of testing, and reports and recommendations from Dr. McCreary, Dr. Wang did not determine in his professional judgment as a doctor in correctional medicine that Sink had a medical need for the wedge pillow he repeatedly requested.

---

[9] "[T]he QMC system is the electronic utilization management tool through which providers located at state-operated Medical Departments submit requests for . . . off-site care" for VDOC inmates, as well as other medical questions about inmate care. Amonette Decl. ¶ 4, ECF No. 97.

Moreover, when Dr. Wang made a QMC request for review of this medical question in mid-June 2018, the VDOC medical administrator also did not find the wedge pillow to be medically necessary.

In short, the court simply cannot find that Sink has presented evidence on which he could persuade a fact finder that Dr. Wang knew of an excessive risk that Sink would suffer serious harm without the requested wedge pillow. Thus, the court concludes that Sink has not demonstrated a necessary element of deliberate indifference and that Dr. Wang is entitled to summary judgment as a matter of law.

### D. Warden Davis.

According to Green Rock grievance records, Sink filed a regular grievance on May 4, 2018, complaining that Dr. Wang refused to order the wedge pillow recommended by the surgeon. On May 22, 2018, after investigating the complaint, Davis issued a Level I response, deeming the grievance unfounded. Davis' response noted that Dr. Wang, as Green Rock's medical authority, is to determine whether or not to approve an outside physician's medical recommendation.

Sink asserts that Davis knew from the grievance that Dr. Wang had refused to provide Sink with the cervical wedge pillow that his surgeon had recommended. As warden of Green Rock, Davis is an administrator. He is not a doctor and does not have credentials or training to provide medical care or to make decisions about the appropriate diagnosis or course of treatment for an inmate's medical conditions. Non-medical supervisory prison officials are entitled to rely on the professional judgment of trained medical personnel. Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990), overruled in part on other grounds by Farmer v. Brennan, 511 U.S. 825, 837 (1994). As such, the court concludes that Warden Davis is entitled to summary judgment as a matter of law.

### III. CONCLUSION.

For the reasons stated, the court concludes that the defendants' motions for summary judgment must be granted. An appropriate order will issue herewith.

The court will send a copy of this memorandum opinion and the accompanying order to plaintiff and counsel of record for the defendants.

**ENTER:** This 25th day of March, 2021.

*/s/ Glen Conrad*
Senior United States District Judge